**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**ARNOLD WAYNE MCCARTNEY,**

       **Petitioner,**

**v.**                                   **Civil Action No. 3:22-CV-103
(GROH)**

**DONNIE AMES, Warden,**

       **Respondent.**

**REPORT AND RECOMMENDATION[1]**

## I.    INTRODUCTION

On June 9, 2022, Petitioner, an inmate at Mount Olive Correctional Complex, by counsel, filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, along with a memorandum and exhibits in support thereof. ECF Nos. 1, 1-1 through 1-9. The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule of Prisoner Litigation Procedure ("LR PL P") 2.

---

[1] Unless otherwise noted, all Electronic Case Filing ("ECF") Numbers cited herein refer to the instant case, Case No. 3:22-CV-103.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A. Conviction and Sentence

On March 2, 2009, Petitioner was charged in the Circuit Court of Lewis, West Virginia, case number 09-F-8, with first degree murder of Vicki[2] Page. ECF No. 1-2 at 2. Petitioner was found guilty by a jury of first degree murder in on February 18, 2010. ECF No. 1 at 1 – 2, see ECF Nos. 1-2 at 11; 1-6, State v. McCartney, 228 W. Va. 315, 719 S.E.2d 785 (2011) ("McCartney I"). The facts of the killing were described in the opinion from Petitioner's direct appeal:

> On December 20, 2008, the petitioner was arrested at his home in Lewis County, West Virginia, for shooting his fiancée, Vickie Paige (hereinafter, the "victim"), in the head at point blank range with a Wesson Firearms Model 41 revolver. The victim was killed instantly. At the time of the shooting, the couple's four-month-old-son was in another room of the home.
>
> Brian Joseph[3], a friend of the petitioner who had been staying with the petitioner and victim, was not present when the shooting occurred. Mr. Joseph, however, was at the home approximately thirty minutes prior to the victim's murder. At trial, Mr. Joseph explained that he was sitting in the living room and heard several "thumping" noises that sounded like a heavy object hitting the floor and wall of the bedroom where the petitioner and the victim were located. Believing that the petitioner was being physically abusive to the victim, Mr. Joseph looked in the bedroom and noticed the victim on the floor. Mr. Joseph then confronted the petitioner about what he was doing and said, "Arnie, please don't." According to Mr. Joseph, the petitioner became angry. He explained that
>
>> it was like a switch went off, he throwed his beer at me and I turned around and went back through the kitchen and he picked up a stack of dishes to throw at me. They hit the sink and I didn't stop, I just—I went right on

---

[2] The correct spelling of the victim's name is "Vickie Page". In the indictment her name was misspelled as "Vicki Page". ECF No. 1-2 at 2. This discrepancy was the source of an objection at trial. The victim's name has also been misspelled in other court filings as "Vickie Paige".

[3] Brian Joseph is also called Barney Joseph. ECF No. 9-16 at 28 – 29.

around the playpen and jumped out the front door,
which there ain't no steps there, so—and I didn't stop,
I just went down to the neighbor's house.

Approximately thirty minutes after Mr. Joseph left the trailer,
the petitioner, with blood on his hands and shoes, walked to a
neighbor's trailer and stated, "I just shot my Vickie." The
neighbor provided a statement to the police detailing the
petitioner's actions. He indicated that the petitioner was calm
and was drinking beer from a can that was covered in blood.

The police were called to the scene and the petitioner was
arrested for murder. The petitioner was read his *Miranda*
rights and he then gave a lengthy recorded statement to the
chief investigating officer. During the statement, the petitioner
admitted that he shot and killed the victim, but claimed that
the shooting was an accident. The petitioner stipulated to the
admissibility of this statement at his trial. The petitioner also
provided a handwritten statement at that time. In the
statement, he explained that:

> Me and Vichy [sic] got into it about my truck being
> broke down.... We started arguing and fighting.... The
> baby was sitting in the blue chair in front of the stove.
> She (Vichy) [sic] was in the bedroom sitting on the bed.
> I went to get the pistol which was in the gun cabinet.
> The cabinet is in the front room. The pistol is a 41
> Magnum. I don't know how many rounds were in the
> pistol. I usually keep some rounds in it. Then I went to
> the bedroom. She set down on the bed and we were
> still arguing. I was standing in front of her. I pointed the
> gun at her. I didn't think it would go off. I accidentally
> pulled the trigger.

After providing that statement, and while the petitioner was
being transported to the regional jail, he made additional
comments to the transporting State Trooper warning him to
"never let your friends move in with you," and "I think she was
fu* *ing him," referring to the victim and Mr. Joseph.

The day after the petitioner was arrested, the chief
investigating officer interviewed him a second time at the
regional jail, prior to his previously scheduled arraignment
before a magistrate. The petitioner was again given the
*Miranda* warnings and he provided the officer with a lengthy
digital recording which was condensed to a handwritten

summary. Consistent with his written statement provided the prior evening, the petitioner maintained that he only intended to scare the victim and that he accidentally pulled the trigger and shot her in the head. The petitioner said that prior to the shooting, he thought the victim might be "cheating" on him with Mr. Joseph because she "used to ... want a whole lot to do with me when we went to bed and stuff and here lately, she just-she just acted like she didn't want that much to do with me." He also explained that "[i]t did kind of aggravate me a little bit when [Mr. Joseph] came in there and asked me if everything was all right." The petitioner then stated that he and the victim

> got into it ... got to arguing back and forth a little bit ... we got to arguing and fighting and I went in there and got my damn pistol ... just to scare her ... and then she sat down on the bed and she kept arguing and I said, 'Well, I don't want to hear it.' We, you know, kept arguing. And I just pointed it at her, you know, and didn't think it was going to go off and I accidentally pulled the trigger.

> The petitioner acknowledged that he ordinarily kept the gun loaded. He further said that he "blacked out" for a short period of time after the shooting. He also asked the investigating officer, "what do you think I am going to get out of this.... Do you think they'll cut me any slack at all?"

ECF No. 1-6, State v. McCartney, 228 W. Va. at 321–22, 719 S.E.2d at 791–92.

Following his conviction, Petitioner testified on his own behalf in the mercy phase, however, the jury denied Petitioner's request for mercy. Based on that recommendation, the Circuit Court sentenced the Petitioner to life imprisonment without mercy, making him ineligible for parole. ECF Nos. 1-2 at 13; 1-6 at 5, 228 W.Va. at 323, 719 S.E.2d at 793.

### B.    Direct Appeal

The defendant filed a direct appeal in the West Virginia Supreme Court of Appeals ("WVSCA" or "Supreme Court of Appeals"). McCartney v. State, 228 W. Va. 315, 719

S.E.2d 785 (2011). Nine[4] issues are addressed in the opinion: (1) that Petitioner's trial was not held within the same term of court, in violation of the one-term rule [228 W.Va. at 323, 719 S.E.2d at 793]; (2) that Petitioner's second statement made at the regional jail violated the prompt presentment rule [Id. at 325, 795]; (3) there was insufficient chain of custody evidence to support admission of the murder weapon into evidence [Id. at 327, 797]; (4) that the coroner's testimony was insufficient evidence to establish that the victim's cause of death was a gunshot to the head [Id.]; (5) that he was denied an opportunity to present a closing argument in the mercy phase [Id. at 328, 798]; (6) that the jury instruction on first degree murder was inadequate [Id. at 329, 799]; (7) that the prosecutor made an improper comment during closing argument [Id. at 331, 801]; (8) that the indictment was defective because the victim's name was misspelled as "Vicki Page" instead of "Vickie Page" [Id. at 332, 802]; and (9) that there was insufficient evidence to convict Petitioner [Id. at 333, 803].

On November 17, 2011, the WVSCA affirmed the judgment of the Circuit Court of Lewis County entered on May 10, 2010. Id. at 334, 804.

### C.    State Habeas Petition

On January 22, 2013, Petitioner, acting pro se, filed a petition for habeas corpus relief in the Circuit Court of Lewis County, case number 13-C-12. ECF Nos. 9-6, 9-7 at 2. Petitioner was appointed counsel and filed an amended petition for habeas corpus on October 12, 2016. ECF Nos. 9-7, 9-11 at 1. In his amended petition, Petitioner asserted his Constitutional rights were violated because his trial attorneys were ineffective when they failed to: (1) conduct adequate voir dire on the issue of mercy; (2) adequately cross

---

[4] Elsewhere in the opinion, the Court describes Petitioner as raising seven [228 W.Va. at 321] and ten [228 W.Va. at 323] arguments, however, nine arguments are addressed on the merits by the Court.

examine and impeach witnesses; (3) introduce mitigating evidence, or make any argument during the mercy phase; (4) draft or propose adequate jury instructions related to his defense that the shooting was accidental; (5) consult or retain an expert witness on competency, criminal responsibility, and diminished capacity; (6) consult or retain an expert witness regarding firearms, ballistics or forensic pathology; and (7) investigate and secure the attendance of witnesses in the guilty and mercy phases of the trial. ECF Nos. 9-7 at 2 – 3; 9-11 at 3 – 4. This petition was denied by the circuit court on February 18, 2020. ECF No. 9-11.

The circuit court addressed each of Petitioner's grounds for relief[5] in its order denying the writ of habeas corpus, including:

1.      Mental competency at the time of the crime or incompetence at time of offense as opposed to time of trial [Id. at 6];

2.      Denial of counsel [Id. at 7];

3.      Unfulfilled plea bargain [Id.];

4.      Ineffective assistance of counsel in the guilt and mercy phases, specifically for:

      a.     Failure to use an expert witness for the defense of diminished capacity or voluntary intoxication;
      b.     Ineffective cross examination and impeachment of State's witnesses;
      c.     Failure to draft or propose a jury instruction related to accidental shooting and failure to use a ballistics expert;
      d.     Failure to object to prejudicial statements of the prosecutor; and
      e.     Failure in the mercy phase to argue for mercy, or present mitigating evidence or testimony on Petitioner's behalf [Id. at 8];

---

[5] Although the order summarizes Petitioner's arguments as listed above, the order addresses the grounds in the order listed herein, including grounds raised by Petitioner during the omnibus hearing, but not in the pleadings. ECF No. 9-11 at 5.

5.      Refusal to subpoena witnesses [Id. at 18];

6.      Jury instructions [Id.]; and

7.      Insufficiency of the evidence [Id. at 19].

ECF No. 9-11. In its order denying relief, the court found that:

> Based on the totality of the circumstances, Trial Counsel['s] performance during the mercy phase of trial was wholly inadequate. Trial counsel failed to prepare Petitioner to testify at the mercy phase of trial, failed to prepare any witnesses to testify on petitioner's behalf, and failed to ask the jury for mercy for their client. Trial counsel claims the decision was made not to give an opening or closing statement based upon their agreement with the Prosecutor that petitioner would be the only testimony and evidence presented at the mercy phase of trial. This "agreement" was not memorialized in writing or put on the record, leaving the details a mystery. Even if the failure to make an opening or closing statement was by some agreement, this court concludes that it is not a reasonable strategy to fail to request mercy on behalf of your client.

ECF No. 9-11 at 16; McCartney v. Ames, No. 20-0242, 2021 WL 2581725, at *3 (W. Va. June 23, 2021) ("McCartney II"). However, the court found that Petitioner was unable to meet the second prong of Strickland:

> In the present case there has been no evidence presented that counsel's failure to argue either in opening or closing of the mercy stage would significantly change the outcome of the mercy phase. This Court is unaware of any additional information that would have been adduced at trial in this matter, which could have been used as a verbalization of a request for mercy and that would have created a "reasonable probability" of a different outcome in this matter.

ECF No. 9-11 at 17 – 18; McCartney v. Ames, 2021 WL 2581725, at *3.

On June 2, 2020, Petitioner appealed the denial of habeas corpus to the WVSCA, in that Court's docket 20-0242. ECF No. 9-12. The appeal raised three assignments of

error by the circuit court: (1) when it denied habeas relief based on ineffective assistance of counsel during the mercy phase; (2) when it denied habeas relief based on ineffective assistance of counsel for failure to obtain expert witnesses to support a diminished capacity, or other defense; and (3) through its cumulative error. Id. at 4. By unpublished memorandum decision issued on June 23, 2021, the Supreme Court of Appeals affirmed the decision of the Lewis County Circuit Court, and addressed each of Petitioner's claims. ECF No. 9-14; 2021 WL 2581725. As to his first claim, that Petitioner received ineffective assistance of counsel during the mercy phase of his trial, the Court found:

> Due to the overwhelming strength of the evidence presented against petitioner during the guilt phase, it is not reasonably probable that the result would have been different if counsel had called witnesses during the mercy phase. Moreover, consistent with the circuit court's order, although petitioner's counsel did not make a plea for mercy, the lack of this argument likewise would not have changed the jury's recommendation of no mercy due to evidence presented at trial as to the circumstances surrounding the murder. Thus, this assignment of error is without merit.

ECF No. 9-14 at 4; McCartney v. Ames, 2021 WL 2581725, at *5. As to Petitioner's second claim, that Petitioner received ineffective assistance of counsel when his attorneys failed to retain expert witnesses, the Court wrote:

> Upon our review of the record, the trial court did not err when it failed to grant petitioner habeas corpus relief regarding his ineffective assistance of counsel claim. . . . that counsel was deficient where they failed to obtain [ ] expert witnesses to address his intoxication and his ability to form intent and further failed to obtain a ballistics or firearm expert to establish that the gun accidentally discharged. At the omnibus hearing, trial counsel testified that the decision not to utilize an expert to address his intoxication was a strategic/tactical decision to protect petitioner. Turning to the second prong of the *Miller*[6]

---

[6] As explained more fully in footnote 9 herein, the Miller test is a West Virginia restatement of the 2-part federal test established in Strickland v. Washington, 466 U.S. 668 (1984), for demonstrating ineffective assistance of counsel.

> test, we agree with the circuit court's determination that
> "based upon the totality of the evidence presented at trial, ...
> it is not reasonably probable that expert testimony regarding
> petitioner's level of intoxication would have changed the
> results of the jury verdict." Further, petitioner's argument that
> his trial counsel were ineffective because they did not retain a
> ballistics/firearms expert at trial is unavailing. At trial, the State
> presented evidence that petitioner shot the victim in the head
> at point-blank range with a gun that was shown to be in perfect
> working order. Based upon this evidence, we fail to see how
> petitioner could satisfy the second prong of the *Miller* test, as
> there is no reasonable probability that a firearms expert would
> have changed the result of the pleadings.

ECF No. 9-14 at 4; <u>McCartney v. Ames</u>, 2021 WL 2581725, at *5. In denying Petitioner's

third claim for relief, the Court stated, "[b]ecause we find that there was no error in this

case, the cumulative error doctrine does not apply." ECF No. 9-14 at 4; <u>McCartney v.</u>

<u>Ames</u>, 2021 WL 2581725, at *6.

### D.    Instant Federal Habeas Petition

On June 9, 2022, Petitioner's counsel filed a petition for habeas corpus, along with

a memorandum and exhibits in support thereof. ECF Nos. 1, 1-1 through 1-9. In his §

2254 petition, Petitioner asserts three grounds for relief, all of which allege that he

received ineffective assistance of counsel at trial:

1.    During the mercy phase of his trial [ECF No. 1 at 6];

2.    When his counsel failed to obtain a diminished capacity
expert witness [<u>Id.</u> at 8]; and

3.    When his counsel failed to obtain a ballistics expert
witness [<u>Id.</u> at 11].

In the accompanying memorandum, Petitioner more specifically argues that he received

ineffective assistance of counsel:

1.    During the mercy phase of his trial because:

a. Counsel inadequately prepared Petitioner to testify in the mercy phase [ECF No. 1-1 at 17];

b. Counsel failed to assess potential character witnesses who could testify on Petitioner's behalf during the mercy phase [Id.];

c. Counsel prepared no argument and made no argument on Petitioner's behalf in the mercy phase [Id.]; and

d. Counsel failed to establish a diminished capacity defense which could have been used in the guilt phase and argued in the mercy phase [Id. at 17 – 18];

2. When his counsel failed to obtain expert witnesses:

a. In support of a diminished capacity defense, to determine competency to stand trial or criminal responsibility [Id. at 25]; or

b. A ballistics expert to testify that the firearm's discharge could have been accidental [Id. at 32].

Petitioner further argues that the Lewis County Circuit Court and West Virginia Supreme Court of Appeals both relied upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Id. at 19. Petitioner contends that he offered written statements by ten potential character witnesses, and numerous certificates showing his rehabilitative work undertaken in 2009 during pretrial detention. Id.

Petitioner asserts that the Supreme Court of Appeals' decision is contrary to or unreasonably applies the holding of Wiggins v. Smith, 539 U.S. 510 (2003). Wiggins overturned the Fourth Circuit's denial of § 2254 habeas relief when trial counsel failed to sufficiently investigate mitigating factors which had a reasonable probability to change the outcome of the penalty phase. ECF No. 1-1 at 20.

Further, Petitioner claims that Circuit Court incorrectly characterized the record, when: (1) the Circuit Court stated that mitigation evidence did not exist, when the information was known and part of the record, and was not offered in the mercy phase [Id. at 21]; and (2) the Circuit Court stated that Petitioner had only post-conviction rehabilitation evidence to offer in mitigation, when the information was instead about pre-trial rehabilitation programming [Id. at 22].

As to Petitioner's claims that his counsel was ineffective for securing expert witnesses on diminished capacity and ballistics, Petitioner asserts that such witnesses were critical to an effective defense. Id. at 25 – 35. Citing to state precedent, Petitioner contends that expert testimony was necessary for a successful diminished capacity defense, which would have resulted in a maximum sentence of 40 years, with parole eligibility in 10 years. Id. at 26. Petitioner asserts that his blood alcohol level of .22 following his arrest demonstrates both his intoxication and his inability to form the requisite intent to commit first degree murder. However, absent expert opinion testimony, Petitioner contends that such a defense was untenable, regardless of his blood alcohol content (BAC) level. Id. at 26 – 27. Further, Petitioner argues that his trial counsels' assertion that they chose not to engage an expert because they did not want expose Petitioner to the possible introduction of 404(b) evidence, or to have to disclose the findings, was contradicted by trial counsel themselves. Id. at 31 – 35.

Finally, Petitioner contends that a ballistics expert could have testified about any possible malfunctioning of the firearm which would have supported Petitioner's defense that the firearm discharged without him pulling the trigger, and was accidental. Id. at 32 – 33.

On November 14, 2022, Respondent filed a motion to dismiss and for summary judgment, along with a memorandum and exhibits in support thereof. ECF Nos. 9, 9-1 through 9-16, 10. In the memorandum, Respondent argues that:

1.    Petitioner failed to meet the second prong of the Strickland test that the outcome of the trial would have been different if his counsel had argued for leniency during the mercy phase, instead of just eliciting testimony from Petitioner himself [ECF No. 10 at 14];

2.    Petitioner's trial counsel's decision not to call character witnesses in the mercy phase was based on sound strategic or tactical reasons, including an agreement reached between counsel for the Petitioner and counsel for the State, that if Petitioner did not call character witnesses, the State would not put on evidence of Petitioner's mistreatment of and threats of violence toward other women, and that counsel's actions were "within the wide range of reasonable professional assistance" [Id. at 20 – 23];

3.    Petitioner's trial counsel was not ineffective at the mercy stage because they adequately prepared Petitioner to testify at that phase, and further, Petitioner failed to meet the second prong of Strickland, by demonstrating that the result of the mercy phase would have been different absent counsel's alleged error [Id. at 24 – 26];

4.    Petitioner did not receive ineffective assistance of counsel based on his trial counsel's failure to pursue expert testimony to support a diminished capacity defense or other defenses [Id. at 26 – 31]; and

5.    Petitioner did not meet the second prong of Strickland because he did not show his counsel was ineffective in not securing a ballistics or firearms expert to show the gun discharged accidentally [Id. at 31 – 33].

Petitioner filed a response in opposition to the motion to dismiss and for summary judgment on December 5, 2022. ECF No. 11. Therein Petitioner first contends the motion to dismiss is unsupported by factual assertions in the pleadings, arguing that it is unreasonable to argue that Respondent has been deprived of information about the

nature of the claim and facts which support the claim, or that the claim is implausible on its face. Id. at 1. Second, Petitioner argues that summary judgment is inappropriate because his mercy phase claim under United States v. Cronic, 466 U.S. 648 (1984), was not addressed by Respondent, and because his claims are meritorious as a matter of law. Id. at 2. Third, Petitioner asserts that the record herein and the State court's rulings that he met the first prong of Strickland contradict Respondent's argument on that ground. Id. at 4. Fourth and finally, Petitioner argues that the record does not support Respondent's assertion that trial counsel's trial tactics were intended to protect Petitioner from the introduction of prejudicial 404(b) evidence. Id. at 5.

## III.   LEGAL STANDARDS

### A.   Petitions for Habeas Corpus Under 28 U.S.C. § 2254

The provisions of 28 U.S.C. § 2254 require a district court to entertain a petition for habeas corpus relief from a prisoner in State custody, but "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(d).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2); see also Williams v. Taylor, 529 U.S. 362 (2000).

A petitioner can only seek § 2254 relief if he has exhausted the remedies available in state court, the corrective process is not available in state court, or the state process is ineffective to protect the petitioner. 28 U.S.C. § 2254(b).

The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d 149 (4th Cir. 2000), cert. denied, 524 U.S. 830 (2001) (quoting Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "confine [it's] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 158.

A federal habeas court may grant relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 364 – 65. A federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 365. "An unreasonable application of federal law is different from an incorrect application of federal law." Id.

14

When a Petitioner challenges the factual determination made by a state court, federal habeas relief is available only if the state court's decision to deny post-conviction relief was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). "In reviewing a state court's ruling on post-conviction relief, we are mindful that 'a determination on a factual issue made by a State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003).

However, habeas corpus relief is not warranted unless the constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Richmond v. Polk, 375 F.3d 309 (4th Cir. 2004). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, supra.

### B.    Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a case when a complaint fails to state a claim upon which relief can be granted. The Federal Rules of Civil Procedure require only, "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited, "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

Plaintiff is proceeding *pro se* and therefore the Court must liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 - 1 (1972) (per curiam); Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197 (2007). Although a complaint need not contain detailed factual allegations, a plaintiff's obligation in pleading, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face." Id. at 555, 570. In Twombly, the Supreme Court found that, "because the plaintiffs [ ] have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. at 570. Thus, to survive a motion to dismiss, a plaintiff must state a plausible claim in his complaint which is based on cognizable legal authority and includes more than conclusory or speculative factual allegations.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id. at 678. "[D]etermining whether a complaint states a plausible claim . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Thus, a well-pleaded complaint must offer more than, "a sheer possibility that a defendant has acted unlawfully," in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id. at 678.

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

### C.    Motions for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion to, "demonstrate the absence of a genuine issue of material fact." 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a verdict." Anderson, supra, at 256. Thus, the nonmoving party must present specific facts showing the existence of a genuine issue for trial, meaning that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248.

To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, supra, at 248.

Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, supra, at 587. "Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. citing First Ntl. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 155, 1592 (1968). See Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). Although any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Matsushita,

supra, at 587-88. <u>Anderson</u>, <u>supra</u>, at 248-49.

## IV.    ANALYSIS

All of the issues raised by Petitioner herein have previously been presented to and adjudicated on the merits in State court in the Circuit Court of Lewis County, which decision was affirmed the WVSCA. While it is not the role of this court to act as an appellate court to the West Virginia courts, Petitioner may still be entitled to relief, if he can demonstrate that he meets either of the two subparagraphs of 28 U.S.C. § 2254(d). "In reviewing a state court's ruling on post-conviction relief, we are mindful that 'a determination on a factual issue made by a State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" <u>Tucker v. Ozmint</u>, 350 F.3d 433, 439 (4th Cir. 2003) (citing U.S.C. §§ 2254(d)(2) and (e)(1).

As discussed more fully below, Petitioner has not demonstrated that the prior State court proceedings were contrary to federal law, or that they were a result of an unreasonable application of federal law. Accordingly, Petitioner has failed to satisfy 28 U.S.C. § 2254(d)(1).

Petitioner has also failed to demonstrate that the state court proceedings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, as Petitioner has failed to satisfy 28 U.S.C. §§ 2254 (d)(1) or (d)(2), and his writ of habeas corpus must be denied.

Petitioner first asserts that the State courts "unreasonably applied the *Cronic* standard, or in the alternative, the *Strickland* standard, regarding trial counsels' conduct surrounding the mercy phase. ECF No. 1-1 at 17. Petitioner next asserts that the circuit

19

court and the Supreme Court of Appeals "relied on outright incorrect determinations to deny relief—factual findings that rise to the level of 'an unreasonable determination of the facts in light of the evidence presented,'" pursuant to § 2254(d)(2). Id. at 19.

In Cronic, the Supreme Court reversed the Court of Appeals, and held that the Court of Appeals erred when "it inferred that [defendant's] constitutional right to the effective assistance of counsel had been violated." 466 U.S. at 652. That inference was based on five criteria: (1) the time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel. Id. at 652 – 653. The Supreme Court found that Cronic did not receive ineffective assistance of counsel, even though his lawyer's practice was in real estate, his counsel had never tried a criminal case, and counsel had only 25 days to prepare after a four and a half year investigation.[7] Further in Cronic, the Supreme Court summarized its prior holdings on the importance of effective assistance of counsel:

> It has long been recognized that the right to counsel is the right to the effective assistance of counsel. The text of the Sixth Amendment itself suggests as much. The Amendment requires not merely the provision of counsel to the accused, but "Assistance," which is to be "for his defence." Thus, the core purpose of the counsel guarantee was to assure "Assistance" at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor. If no actual "Assistance" "for" the accused's "defence" is provided, then the constitutional guarantee has been violated. To hold otherwise could convert the appointment of counsel into a sham and nothing more than a

_____

[7] The Supreme Court concluded that the other criteria—the gravity of the charge, the complexity of the case, and the accessibility of witnesses—were "all matters that may affect what a reasonably competent attorney could be expected to have done under the circumstances, but none identifies circumstances that in themselves make it unlikely that [the defendant] received the effective assistance of counsel." 466 U.S. 666.

formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment.

Thus, . . . the accused is entitled to "a reasonably competent attorney," whose advice is within the range of competence demanded of attorneys in criminal cases. [We have] held that the Constitution guarantees an accused "adequate legal assistance", [and] the criminal defendant's constitutional guarantee [is] of "a fair trial and a competent attorney."

. . . .
The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. It is that "very premise" that underlies and gives meaning to the Sixth Amendment. It is meant to assure fairness in the adversary criminal process. Unless the accused receives the effective assistance of counsel, a serious risk of injustice infects the trial itself.

Thus, the adversarial process protected by the Sixth Amendment requires that the accused have counsel acting in the role of an advocate. The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. . . While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators.

. . . .

[B]ecause we presume that the lawyer is competent to provide the guiding hand that the defendant needs, the burden rests on the accused to demonstrate a constitutional violation.

United States v. Cronic, 466 U.S. 648, 654–58 (1984) (internal citations omitted).

21

The two-part test established in <u>Strickland</u> was not modified in <u>Cronic</u>[8], thus, Petitioner's reference to "the <u>Cronic</u> standard" [ECF No. 1-1 at 17] is inapplicable. Instead, this court applies the two-pronged <u>Strickland</u> performance and prejudice standard to Petitioner's claims.

### A.   Petitioner's First Claim: Ineffective Assistance of Counsel at the Mercy Phase

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984),[9] the Supreme Court of the United States established a two-part test to determine whether counsel was constitutionally ineffective. Under the first prong, Petitioner must demonstrate that his counsel's performance was deficient and "fell below an objective standard of reasonableness." <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984). But, "[j]udicial scrutiny of counsel's performance must be highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense assistance after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Id.</u> at 689. In addition, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. <u>Id.</u> at 689-90. There are no absolute rules for determining what performance

---

[8] The Fourth Circuit has recognized, "In *Cronic,* the Court reiterated the general *Strickland* rule and also provided that '[t]here are ... circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.' " <u>United States v. Ragin</u>, 820 F.3d 609, 618 (4th Cir. 2016) (quoting <u>Cronic</u>, 466 U.S. at 658, 104 S.Ct. 2039).

[9] The West Virginia Supreme Court of Appeals explicitly adopted the <u>Strickland</u> test in Syllabus Point 5 of <u>State v. Miller</u>, 194 W.Va. 3, 6, 459 S.E.2d 114, 117, (1995), which held:

In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

is reasonable. See Hunt v. Nuth, 57 F.3d 1327, 1332 (4th Cir. 1995) (noting counsel's representation is viewed on the facts of a particular case and at the time of counsel's conduct).

Under the second prong, Petitioner must show that the deficient performance caused him prejudice. Strickland, 466 U.S. at 687. To demonstrate such prejudice, "the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 669. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." Id. The Supreme Court has further held that to show prejudice, Petitioner must show "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993) (quoting Strickland, 466 U.S. at 687 (1984)). Consequently, if counsel's errors have no effect on the judgment, the conviction should not be reversed. Strickland, 466 U.S. at 691. The Fourth Circuit has recognized that, if a defendant "cannot demonstrate the requisite prejudice, [then] a reviewing court need not consider the performance prong" and vice versa. Fields v. Att'y Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992).

A review of the record shows the state circuit court found that Petitioner met the first prong of the Strickland test necessary to merit habeas relief, because his counsel during the mercy phase was ineffective. However, the Lewis County Circuit Court found that Petitioner could not meet the second prong of the Strickland test, and therefore was not entitled to relief. ECF No. 9-11. The WVSCA affirmed that decision by memorandum decision, addressing the circuit court's "finding that neither Strickland prong was satisfied regarding the diminished capacity defense as well as any other asserted pretrial and guilt

phase issues." 2021 WL 2581725 at *3. As to Petitioner's other claims, the Supreme Court of Appeals wrote:

> Turning to petitioner's argument that his counsel was ineffective during the mercy phase of his trial, we likewise fail to find that the circuit court erred in denying his writ of habeas corpus. As to this issue, petitioner argued that his counsel were ineffective because they did not call any witnesses and they failed to make a meaningful plea for mercy on his behalf. Due to the overwhelming strength of the evidence presented against petitioner during the guilt phase, it is not reasonably probable that the result would have been different if counsel had called witnesses during the mercy phase. Moreover, consistent with the circuit court's order, although petitioner's counsel did not make a plea for mercy, the lack of this argument likewise would not have changed the jury's recommendation of no mercy due to evidence presented at trial as to the circumstances surrounding the murder. Thus, this assignment of error is without merit.

Id. at *5.

In the instant § 2254 proceeding, Petitioner alleges that he received ineffective assistance of counsel during the mercy phase in four ways.

### 1. Claim A.1.: Counsel did not Adequately Prepare Petitioner to Testify in his Own Defense in the Mercy Phase

Applying the two-prong Strickland standard to his trial counsel's actions, it is clear that Petitioner cannot meet both prongs of the test as to this ground. Assuming *arguendo*, consistent with the State court's determination, that Petitioner meets the first prong of Strickland, because his counsel's actions fell below an objective standard of reasonableness, Petitioner still cannot meet the second prejudice prong of Strickland.

To do so, Petitioner must demonstrate that there was a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. Regardless of whether Petitioner was adequately prepared by his counsel

to testify in the mercy phase, there is little to no reasonable probability that the results would have been different if counsel had more thoroughly prepared Petitioner to testify.

Prior to the mercy phase, the jury heard that on December 20, 2008, Petitioner was angry at his fiancé, Vickie Page, and that the two were arguing in their bedroom before he shot her. During the argument, Petitioner went to the living room to get a gun to "scare" Page, because he believed she was cheating with another man, Brian "Barney" Joseph, who had been staying with the couple. Within minutes of returning to their bedroom with the gun, Petitioner shot Page in the head at point blank range, killing her instantly. The jury had also already heard testimony from Joseph, and from Petitioner's cousin and neighbor, Jason DeWayne Dehainant, who testified that after Petitioner shot Page, he came to Dehainant's home, with blood on his shoes and hands, and announced that he had "shot Vickie". ECF No. 9-15 at 115 – 116; 132; 134 – 135; 137 – 138; 142. Dehainant further testified that Petitioner was holding a bloody beer can when he arrived that day. Id. at 134 – 135, 142. Both men testified that Petitioner was not crying at the time he came to Dehainant's house. Dehainant further testified that Petitioner arrived five to ten minutes after Joseph arrived, and that Joseph was scared when he arrived at Dehainant's house. Id. at 140.

Further, the jury head the statement given by Petitioner to Trooper Morgan on the night of Page's killing. Id. at 194 – 215. Therein, Petitioner stated that: he "wished that hadn't happened" [Id. at 200]; "I love her so much, man, I mean, I was stupid over her. I mean, I know, they say love kills, it does." [Id. at 201]; "we got to arguing and fighting and I went in there and I got my damn pistol . . . just to scare her. You know, I mean, I was just going to – figure, you know, maybe we can just work everything out and –" [Id. at 202

– 203]; they "argued two or three minutes there before the gun went off" [Id. at 204]; when "I went back in there and I just – man, I mean, I just went to scare her and the mother f[ ]er went off and I picked her up, that's how I got that blood on me. I picked her up and held her and was crying and shaking" [Id. at 203]; he knew his gun was loaded because he had the gun during bear season and usually kept some rounds in it [Id. at 204 – 205]; but that he didn't check to see if the gun was loaded [Id. at 205]; she "was my wife, I was getting ready to get married to her" [Id.]; Page "kept arguing and I said 'well, I don't want to hear it.' We, you know, kept arguing. And I just pointed it at her, you know, and didn't think it was going to go off and I accidentally pulled the trigger, cause it's a double action and when it went off, it went 'boom' and that's when I flipped, man, I just . . . I blacked out after that" [Id. at 206]; "actually, I didn't really point it, I mean, I just went like – you know, just turned it. I mean, man, I love her. I love her with all my heart. There will never be another one." [Id. at 207]; "I told her I loved her and don't leave me. And she never did answer me back." [Id.]; then "I told [my parents] me and Vickie was fighting and the gun went off." [Id. at 208].

These were essentially the same points raised by counsel in questioning the Petitioner in the mercy phase. Moreover, the statements given by Petitioner on the night of the killing showed that: he believed Page was cheating with another man; he intended to brandish a firearm at Page in order to frighten her; he intended to "win" the argument through a show of force by brandishing the gun; he usually kept his firearms loaded; he realized he pointed the gun at Page; and he acknowledged that he pulled the trigger, although he claimed that he pulled the trigger accidentally. The totality of the facts presented to the jury, including Petitioner's own inculpatory statements to law

enforcement, were unlikely to be forgotten or overridden by Petitioner's later requests for leniency. It is unlikely with such damning testimony that more compelling testimony from the Petitioner in the mercy phase would have changed the outcoming of the mercy phase.

Accordingly, Petitioner cannot meet the second prong of <u>Strickland</u> because he cannot demonstrate that absent counsel's alleged unprofessional errors, that the result of the proceeding would have been different. It appears that Petitioner was angry at his fiancé. He left the room where they argued to retrieve a firearm in order to brandish it at her because he believed her to be unfaithful. And he knowingly pointed the gun at her. Critically, Petitioner did not allege that the gun accidentally discharged, but rather that he accidentally pulled the trigger. A jury could reasonably have found that these actions constituted a plan formed in a moment, which was carried out in the next moment, resulting in the type of malice aforethought which does not merit mercy in sentencing. It is not reasonably likely that further preparation of the Petitioner to testify in his own behalf at the mercy phase would have changed the result, based on the evidence already presented in the guilt phase. Because Petitioner cannot meet both prongs of <u>Strickland</u> on this ground, he is not entitled to habeas relief.

Further, as to Petitioner's claim that the State court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or decided a case differently than this Court has on a set of materially indistinguishable facts, his claim under § 2254(d)(1) fails. Petitioner contends that the holdings of <u>Strickland</u> and <u>Cronic</u> merit relief. However, Petitioner fails to explain how the State courts arrived at a conclusion opposite of the holdings of either of those two cases. A review of Petitioner's brief shows that the argument asserted as to the "contrary to" or "unreasonable

application" of federal law as determined by the United States Supreme Court is based on the holding of Wiggins. ECF No. 1-1 at 20 – 22. However, Wiggins concerns counsel's investigation of mitigating factors to present in the sentencing phase, not preparation of a defendant to testify in the sentencing phase. Accordingly, Petitioner fails to explain how his testimony at the mercy phase was so deficient as to demonstrate ineffective assistance in preparing him to testify in the mercy phase. Petitioner broadly claims that the State courts arrived at a conclusion opposite to that reached by the United States Supreme Court, but relies on no applicable precedent, thus this claim is without merit.

In Williams, 529 U.S. 362, 364 – 65 (2000), the Supreme Court held that a federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Further, the Supreme Court stated in Williams that, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 365. Again, Petitioner fails to explain how the State courts made an unreasonable determination of the facts in light of the evidence presented in the State court as to this ground. Petitioner argues that trial counsel spent only sixteen minutes between the guilt and mercy phases of trial to prepare him to testify. ECF No. 1-1 at 19. However, as discussed in Section IV.A.2. below, in the omnibus hearing, Petitioner's counsel testified that counsel anticipated that there could have been a first degree murder verdict, and that Petitioner would have to be prepared to deal with that. ECF No. 9-10 at 33:19 – 21. Petitioner fails to demonstrate that the State court's holding was contrary to federal law as decided by the Supreme Court or was an

unreasonable application of the facts to the law on the issue of ineffective assistance of counsel. Accordingly, his claim on this ground lacks merit and should be dismissed.

### 2. Counsel did not Adequately Assess Potential Character Witnesses to Testify in the Mercy Phase

Petitioner argues that his counsel was ineffective by failing to offer in mitigation either the testimony of up to ten character witnesses, or certificates of rehabilitation work he completed during his pre-trial detention. ECF No. 1-1 at 19. Respondent counters that Petitioner's counsel's decision not to call character witnesses was made as part of a trial strategy, including limiting witnesses who could "open the door" to testimony about other unrelated prior bad acts of the Respondent, such as his prior threats of violence[10] to other women. ECF No. 10 at 19 – 24. Further, citing to both West Virginia and federal case law, Respondent contends that, "when character witnesses are family members or friends, their credibility is more likely to be questioned given their relationship with the defendant." Id. at 20, quoting State ex rel. Kitchen v. Painter, 226 W.Va. 278, 289, 700 S.E.2d 489, 500 (W. Va. 2010).

As to his counsel's decision not to call family and friends as character witnesses in the mercy phase, when viewed under the two-pronged Strickland standard, Petitioner cannot meet the second prong, which requires him to demonstrate that but for counsel's decision, the result of the mercy phase would reasonably have changed. In light of the evidence presented during the guilt phase[11], it is unlikely that any testimony by family and

---

[10] At the state habeas omnibus hearing, one of Petitioner's trial lawyers testified, "I recall speaking to—witnesses on that, and—off the top of my head, the—the one thing that stands out in my mind was some girl had indicated that [Petitioner] had threatened to cut her throat with a hoof knife and let her bleed out in the driveway, or something to that effect." ECF No. 9-10 at 54:15 – 19. See also Id. at 55:2 – 13.

[11] As discussed above, that Petitioner was enraged at his fiancé, that he purposefully went to get a gun to frighten her, then within minutes of retrieving the loaded weapon from another room, he returned and proceeded to fatally shoot her at point blank range.

friends would reasonably establish that Petitioner was a peaceful person, and that his

conduct on the night he killed Vickie Page merited a finding of mercy.

Further, at the omnibus habeas corpus hearing in Lewis County Circuit Court,

Petitioner's trial counsel Steven B Nanners testified:

> Q:    Tell us when you worked with Mr. McCartney in preparation for his testimony at the bifurcation state.
> A:    We worked with Mr. McCartney [ ] prior to trial. I don't have a date specific. I don't have – details on that. All I know is that we went over these matters with Mr. McCartney. We explained to him that – **with respect to our agreement with [the prosecutor], that he would be permitted to get on the stand and show his remorse for – his actions. And that [the prosecutor] would not present [ ] 404(b)[12] character evidence.**
> Q:    Well, that conversation with [the prosecutor] took place between the guilty phase and the mercy phase; correct?
> A:    Again, like I said earlier – it happened during the trial. Whether it was between the two, I don't know. I just know that –
> Q:    Well, if he had been found guilty of second degree murder or . . . voluntary manslaughter, you wouldn't have had a mercy phase; correct:
> A:    Correct.
> Q:    Okay. So, the decision whether or not to put him on the stand could, therefore, not have occurred until he was found guilty of first degree murder:
> A:    That's not true. Because you anticipate there could be a verdict of murder one (1), and that he would have to be prepared to deal with that.

ECF No. 9-10 at 32:21 – 33:21 (emphasis added). This testimony shows that counsel

was concerned with the nature of the testimony he wanted to exclude from the jury, rather

than the characterization of that testimony under the Rules of Evidence. Further, the West

---

[12] Although counsel referred to prior bad acts testimony as "404(b)" evidence, under West Virginia Rule of Evidence 404(b), such reference would be more appropriate in a discussion of prior bad acts testimony presented during the guilt phase, and not at the penalty phase.

Virginia Supreme Court of Appeals has held in Syllabus Point 7 of <u>State v. McLaughlin</u>,

226 W.Va. 229, 700 S.E.2d 289 (2010):

> The type of evidence that is admissible in the mercy phase of
> a bifurcated first degree murder proceeding is much broader
> than the evidence admissible for purposes of determining a
> defendant's guilt or innocence. Admissible evidence
> necessarily encompasses evidence of the defendant's
> character, including evidence concerning the defendant's
> past, present and future, as well as evidence surrounding the
> nature of the crime committed by the defendant that
> warranted a jury finding the defendant guilty of first degree
> murder, so long as that evidence is found by the trial court to
> be relevant under Rule 401 of the West Virginia Rules of
> Evidence and not unduly prejudicial pursuant to Rule 403 of
> the West Virginia Rules of Evidence.

The Supreme Court of Appeals further explained in <u>State v. Trail</u>, 236 W. Va. 167, 180–

81, 778 S.E.2d 616, 629–30 (2015):

> Indeed, the issue during the mercy phase of a bifurcated trial
> is whether or not the defendant, who already has been found
> guilty of murder in the first degree, should be afforded mercy,
> *i.e.,* afforded the opportunity to be considered for parole after
> serving no less than fifteen years of his or her life sentence.

Moreover, <u>McLaughlin</u> recognized its prior precent in <u>State ex rel. Dunlap v. McBride</u>, 225

W.Va. 192, 691 S.E.2d 183 (2010), which addressed a similar issue to that presented

here. In <u>Dunlap</u> "the defendant argued that the State improperly was allowed to introduce

evidence of other bad acts including numerous incidents of violent conduct by the

defendant toward his former wife and their children during the penalty phase without the

trial court conducting a *McGinnis* hearing." <u>State v. McLaughlin</u>, 226 W. Va. 229, 240,

700 S.E.2d 289, 300 (2010). However, the <u>Dunlap</u> court found no error, stating:

> Mr. Dunlap has failed to cite to any decision of this Court
> where we have required a *McGinnis* hearing for sentencing
> purposes only. As a general matter, the rules of evidence,
> including Evid. R. 404(b) regarding 'other acts,' do not strictly

> apply at sentencing hearings. It has been held that Rule 404(b) does not apply to the penalty or punishment phase of a bifurcated trial. Moreover, a trial court has wide discretion in the sources and types of evidence used in determining the kind and extent of punishment to be imposed. And a sentencing court is not restricted by the federal constitution to the information received in open court." Therefore, we find this issue to be without merit.

Id. (cleaned up). Accordingly, the prior bad acts evidence of Petitioner threatening to cut the throat of an old girlfriend could have been presented by the State in the mercy phase, without prior notice under § 404(b), and without a McGinnis hearing on the admissibility of that evidence. Counsel's agreement not to present family and friends as character evidence, which likely would not have been terribly persuasive, was intended to prevent the introduction of testimony by the State which would have been decidedly worse. Evidence that a convicted murderer had previously threatened to kill another woman would almost certainly have resulted in a finding of no mercy for the Petitioner. Excluding that evidence offered an opportunity for Petitioner to express his remorse and regret in the mercy phase, without further damaging him before the jury. This strategic decision by counsel falls well "within the range of competence demanded of attorneys in criminal cases," as mandated by Cronic. Further, reviewing counsel's performance under the highly deferential standard established in Strickland, this Court does not find that counsel's acts or omissions were unreasonable. Finally, Petitioner cannot demonstrate, as held in Lockhart, that "counsel's errors were so serious as to deprive [him] of a fair trial". Accordingly, Petitioner cannot meet the second prejudice prong of Strickland, and is not entitled to habeas relief on this ground.

As to Petitioner's claim that the State court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law or decided a case

32

differently than this Court has on a set of materially indistinguishable facts, his claim fails. As discussed above, Petitioner cannot meet the standards discussed in <u>Strickland</u>, <u>Cronic</u>, or <u>Lockhart</u> as to this claim. Although a federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case," <u>Williams</u>, 529 U.S. at 364 – 65, Petitioner has failed to demonstrate that such circumstances are present. Accordingly, because there was not an unreasonable application of federal law as relates to this claim, Petitioner is not entitled to habeas relief on the claim.

### 3.    Counsel did not Prepare or Make an Argument for Mercy

As to Petitioner's claim regarding his counsel's failure to make an argument for mercy in the mercy phase, he is unable to meet the two-prong <u>Strickland</u> test to demonstrate that his counsel was ineffective on that ground. Respondent contends that trial counsel argued extensively for leniency in the closing argument of the guilt phase, citing to the transcript of the closing argument. ECF No. 10 at 16.

In <u>Strickland</u>, the Supreme Court held that judicial scrutiny of counsel's performance must be highly deferential:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

> assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged
> action "might be considered sound trial strategy."

Strickland v. Washington, 466 U.S. 668, 689 (1984) (internal citations omitted). This Court is not here to second-guess counsel's tactics at trial including in the mercy phase.

Counsel made tactical decisions to argue some issues in the guilt phase, to the exclusion of other issues, and to not make further argument in the mercy phase. Those decisions are strongly presumed to have been made in the exercise of reasonable professional judgment, and accordingly, counsel's performance in this regard did not fall below an objective standard of reasonableness.

Counsel argued that while the jury considered the charged offense of murder, it should also consider convicting Petitioner of three lesser included offenses: (1) second degree murder which lacks the elements of premeditation, and deliberation; (2) voluntary manslaughter which lacks the elements of malice, premeditation, and deliberation; and (3) involuntary manslaughter based on Petitioner's unintentional acts made with reckless disregard for the safety of others. ECF No. 9-16 at 175. Further, counsel argued that acquittal was a fifth choice. Id. at 175 – 76. Counsel argued that the jury should consider Petitioner's mental state of intoxication and that he was "out of his mind drunk", which prevented Petitioner from forming the requisite intent to commit premeditated murder. Id. at 177 – 78. Based on the level of Petitioner's intoxication, counsel argued that Petitioner could not be convicted of any lesser included offense save involuntary manslaughter. Id. at 178.

Counsel further argued that a killing in the heat of passion, when a person flies into an uncontrollable rage is voluntary manslaughter, and that if the jury believed that

Petitioner was provoked into such a rage, that the jury should return a more lenient verdict. Id. at 178 – 80. Further, counsel argued that Petitioner's remorse was severe and immediate, that he was "agonized over this", and that his actions were a "stupid" accident, and that Petitioner did not know if his gun was loaded or not. Id. at 185, 188 - 189.

Again, this Court will assume that the State court properly found that counsel was ineffective in not presenting argument in the mercy phase. Nonetheless, the Court finds that Petitioner cannot meet the second prong of Strickland, because he cannot show that the result of the proceeding would have been different but for his counsel's alleged errors.

Rather, there was no reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. Petitioner's own statements to law enforcement which were introduced into evidence showed Petitioner was a man who was heavily intoxicated, convinced his fiancé was having an affair, retrieved a firearm to threaten his fiancé in order to win an argument, and within two or three minutes of getting the firearm, fatally shot her in the head. Critically, Petitioner's own statement was that he *accidentally pulled* the trigger and shot Vickie Page. Petitioner also claimed that the gun *discharged accidentally*. However, considering the other circumstantial and uncontroverted evidence of Petitioner's rage, intoxication, and intent to get a firearm to frighten the victim, it is not likely that an argument by counsel on the issue of mercy would have changed the outcome of the mercy proceeding. Because there is no reasonable probability that absent counsel's alleged ineffective assistance that the outcome would have been different, petitioner cannot meet the second prong of Strickland and does not merit relief on this ground.

As to Petitioner's claim that the State court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law or decided a case differently than this Court has on a set of materially indistinguishable facts, his claim fails. Petitioner claims that the decision of the WVSCA is contrary to or unreasonably applies the holdings of Wiggins v. Smith, 539 U.S. 510 (2003), "in which the United States Supreme Court overturned the Fourth Circuit's denial of federal habeas relief when trial counsel had failed to sufficiently investigation mitigation factors that had a reasonable probability of changing the outcome at the penalty phase." ECF No. 1-1 at 20. Wiggins was a § 2254 proceeding where the Supreme Court overturned the defendant's death penalty sentence where the counsel told the jury that they would hear evidence of the defendant's difficult life, but then failed to present any evidence of defendant's life history or family background which included an alcoholic parent, and repeated physical and sexual abuse in his home, in more than one foster homes, and in other placements. 539 U.S. at 515 – 517. The Supreme Court found that the record supported a finding that:

> [Counsel's] failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment. Counsel sought, until the day before sentencing, to have the proceedings bifurcated into a retrial of guilt and a mitigation stage. On the eve of sentencing, counsel represented to the court that they were prepared to come forward with mitigating evidence, [ ] and that they intended to present such evidence in the event the court granted their motion to bifurcate. In other words, prior to sentencing, counsel never actually abandoned the possibility that they would present a mitigation defense. Until the court denied their motion, then, they had every reason to develop the most powerful mitigation case possible.

539 U.S. at 526. By contrast, here, counsel had developed a mitigation case, which included character witness statements, as discussed in Section IV.A.1. above. The facts

in Wiggins are distinguishable, and the State court did not make finding that was contrary to or an unreasonable application of that Supreme Court case. Accordingly, because there was not an unreasonable application of federal law as relates to this claim, Petitioner is not entitled to habeas relief on the claim.

Moreover, because counsel determined that it was strategically advantageous to ensure that damaging State evidence was not presented in the mercy phase, counsel elected not to present evidence other Petitioner's own testimony, or argue at the mercy phase. In retrospect, this decision may be questioned, but it is not the purpose of this Court to engage in 20/20 hindsight to second-guess trial strategies. See Strickland, 466 U.S. 668, 680 (1984). The fact that Petitioner believes that trial counsel should have made certain arguments or introduced certain evidence does not mean that trial counsel was required to do so. An unsuccessful defense counsel is not necessarily an ineffective one. See Id. at, 690. For all these reasons, Petitioner is unable to meet the second prong of Strickland and is not entitled to relief on this ground. Because Petitioner has also failed to show that any state court adjudication resulted in a decision that was based on an unreasonable determination of the facts, Petitioner has failed to satisfy § 2254(d)(2). As Petitioner has failed to satisfy either §§ 2254(d)(1) or (d)(2), and this claim is without merit under § 2254, and must be denied.

>    **4.    Counsel did not Establish a Diminished Capacity Defense in the Guilt Phase, Which Also Could have been Argued in the Mercy Phase.**

Petitioner argues that his counsel did not establish a diminished capacity defense which could have been argued in the guilt and mercy phases. The WVSCA in its order denying habeas relief noted that, "the circuit court entered an order denying petitioner's

requested relief, finding that neither Strickland prong was satisfied regarding the diminished capacity defense as well as any other asserted pretrial and guilt-phase issues." McCartney v. Ames, No. 20-0242, 2021 WL 2581725 at * 2 (W.Va. June 23, 2021). Further, the WVSCA ruled that:

> At the omnibus hearing, trial counsel testified that the decision not to utilize an expert to address his intoxication was a strategic/tactical decision to protect petitioner. Turning to the second prong of the *Miller* test, we agree with the circuit court's determination that "based upon the totality of the evidence presented at trial, ... it is not reasonably probable that expert testimony regarding petitioner's level of intoxication would have changed the results of the jury verdict."

Id. at *5.

Further, as discussed more fully in Section IV.B. below, trial counsel did obtain a jury instruction regarding diminished capacity. Counsel argued in the guilt phase that because of his intoxication, Petitioner had a diminished capacity such that he lacked the ability to form the requisite intent to commit murder. In West Virginia, "[A] defendant who raises a diminished capacity defense ... challenges his capacity to premeditate and deliberate *at the time of the criminal act*." State v. Joseph, 214 W. Va. 525, 533, 590 S.E.2d 718, 726 (2003) (quoting Commonwealth v. Brown, 396 Pa.Super. at 181–82, 578 A.2d at 466 (emphasis added)). Although counsel did not argue this point in the mercy phase, the argument was presented to the jury in the guilt phase, and found it unpersuasive. Accordingly, it is unlikely that the jury would have found a second presentation of the same argument persuasive in the mercy phase, such that presentation of the argument would have changed the outcome.

As in Sections IV.A.1. through 3. above, this Court assumes for purposes of argument and consistent with the findings of the State courts, that counsel was ineffective in the mercy phase, thereby satisfying the first prong of the <u>Strickland</u> test. However, Petitioner has failed to demonstrate a reasonable probability of a different outcome in the mercy phase, and therefore cannot meet the second prong of <u>Strickland</u>. As discussed in Section IV.A.1. above, the facts related to Petitioner's decisions on the night he killed Ms. Page were damaging. Those facts as repeated extensively herein are as follows: (1) that while arguing with his fiancé about her alleged unfaithfulness, Petitioner retrieved a weapon from another room; (2) failed to check the weapon to determine if it was loaded, despite a habit of keeping his firearms loaded; (3) pointed the gun at his fiancé's head in an effort to frighten her such that Petitioner could "win" the argument; and (4) he "accidentally" pulled the trigger. In addition to those damaging facts, the jury was also presented with evidence concerning Petitioner's level of intoxication, including that he had drunk as much as a twelve-pack of beer throughout the day. Although Petitioner's counsel successfully obtained a jury instruction regarding diminished capacity, and argued that because of his intoxication Petitioner had diminished capacity on the night he killed Vickie Page, the jury did not find that argument persuasive. In light of the substantial facts presented through State witnesses and Petitioner's own statements, it was not reasonably likely that the jury would have reached another conclusion in its decision on mercy. Therefore, Petitioner fails to demonstrate any prejudice resulted from any ineffective assistance of his counsel. Accordingly, Petitioner fails to meet the second prong of the <u>Strickland</u> test and is not entitled to habeas relief.

As to Petitioner's contention that he is entitled to relief under § 2254(d)(1) because the State court misapplied <u>Strickland</u>, the undersigned disagrees. The State court found that Petitioner did not receive ineffective assistance of counsel under the <u>State v. Miller</u> standard, which is a State-court adoption of <u>Strickland</u>.

Further, Petitioner has failed to show that any State court adjudication resulted in a decision that was based on an unreasonable determination of the facts, Petitioner has failed to satisfy § 2254(d)(2). As Petitioner has failed to satisfy either §§ 2254(d)(1) or (d)(2), and this claim is without merit under § 2254, and must be denied.

**B.    Petitioner's Second Claim: Forensic Evaluation for Diminished Capacity Defense**

Petitioner alleges that his trial counsel was ineffective for not obtaining an expert witness to testify regarding his intoxication, and that severe intoxication could have prevented Petitioner from forming the requisite intent necessary to commit first degree murder. ECF No. 1-1 at 25. As with Petitioner's first claim, his second claim was adjudicated on the merits in state court proceedings, thus, to succeed in this § 2254 petition, Petitioner must satisfy the requirements of either §§ 2254(d)(1) or (d)(2).

Petitioner contends that the State courts "unreasonably applied *Strickland* regarding the Petitioner's complaints of the failure to obtain expert witnesses – especially a diminished capacity expert." ECF No. 1-1 at 25. However, despite lengthy argument as to Petitioner's wish that his counsel had pursued expert testimony, and how such expert testimony might have benefitted his defense, Petitioner fails to explain how the State court unreasonably applied <u>Strickland</u> as to his claims regarding a diminished capacity expert. <u>Id.</u> at 25 – 35.

Regardless of whether Petitioner's counsel obtained expert testimony on the topic of diminished capacity, counsel obtained a jury instruction on the issue of voluntary intoxication and argued for leniency based on that instruction. The trial court instructed the jury that:

> [A]lthough intoxication will never provide a legal excuse for the commission of a crime, the fact that a person may have been intoxicated at the time of the commission of a crime may negate the specific intent to kill, form malice, or act with premeditation or deliberation. So, evidence that a Defendant acted while in a state of intoxication is to be considered in determining whether or not the Defendant acted with specific intent to kill maliciously or premeditatedly and deliberately. If the evidence in the case leaves the jury with a reasonable doubt whether, because of the degree of an intoxication, the mind of the accused was incapable of performing the specific intent to kill, or was incapable of acting maliciously or was incapable of acting with premedication or deliberation, the jury should acquit the Defendant of Murder in the First Degree.

> Further, if the evidence in the case leaves the jury with a reasonable doubt whether, because of the degree of intoxication, the mind of the accused was incapable of performing or did form this specific intent to kill, or was incapable of acting maliciously, the jury should acquit the Defendant of Murder in the Second Degree.

ECF No. 9-16 at 162 – 63. During closing argument in the guilt phase, trial counsel argued that:

> Their own evidence dictates that you should acquit Arnold McCartney. The very evidence that they bring in here and tell you now, "we want you to convict him of First Degree Murder", is the very evidence that shows that you should not convict him of First Degree Murder.

> I want to talk to you about what we know about Arnold McCartney on this morning that this happened. Arnold McCartney was intoxicated, he was drunk. He had been drinking beer all day. The State's own witnesses have said that. Barney was talking about it, 'yeah he was drinking all this

beer'. Intoxication was clearly proved by the evidence in this case.

You'll recall Brian Joseph, he started drinking beer early, when Vickie left. It was about 9:30 or 10:00 when he woke up and Arnold was already drinking. I even think he said, "He was drinking tow, three, four beers to my one." Kept drinking all day. Eventually, he passed out about 3:00, 3:30, he was in the bed. And then Vickie came home about 4:00 o'clock or so and woke him up. He started drinking again. He had been drinking all day. Even Trooper Morgan, the Trooper that charged him with First Degree Murder, even he acknowledges he was drunk. You cannot drink that much alcohol all day without being intoxicated.

With that intoxication, I think we've got to look to whether or not the State can establish its burden of proof beyond a reasonable doubt as instructed, as to whether he acted intentionally, whether he was able to form in him mind the intent to kill, whether he was able to form a malicious intent, or whether he was able to deliberate in a cool state of mind. All of those are necessary. And when the State presents its evidence and says, "Yeah, he was drunk," they are disproving their own case. He should never have been charged with First Degree Murder in the first place, never should have. When that Trooper walks up there and sees a guy just out of his mind drunk, and, you know, "I didn't mean to do it," that's not First Degree Murder. He just charged him with the first thing he thought of, that's what happened. He's a young Trooper and this was a big case, but he knows it doesn't add up to that and the State does, too.

Barney also testified as you recall, that Arnie was getting more and more drunk all day, and he fell down, fell down in the living room.

And you recall Arnie's statement, the night in question, when Trooper Morgan first arrived on scene with the others, after the 911 call. Here is Arnold McCartney, just—still at the scene, still right there and this is what he says, "Officer: How much have you had to drink today? Defendant: Oh, I don't know, probably a 12-pack." So he already knows he's had a 12-pack of beer, at least. . . [T]he testimony of Trooper Morgan, acknowledging that he was drunk. And when you apply this to the charge, you've go to assess whether or not the State can prove that Arnold McCartney formed that intent to kill, or was he merely acting drunk, okay? Was he acting maliciously or

> was arising out of his intoxication? Was he acting premeditatedly and deliberately or was this out of intoxication? If you have a reasonable doubt as to any of those, because he was so intoxicated, you must acquit him. You must acquit him of First Degree Murder, you must acquit him of Second Degree Murder. . . . He doesn't have to have intent on the Involuntary Manslaughter. . . And if you believe because of believe because of that intoxication he was unable to form that intent to kill, then you must acquit.

ECF No. 9-16 at 176 – 178. Counsel successfully obtained an instruction on, and argued

the defense of involuntary intoxication at trial. As noted by the Fourth Circuit:

> Criminal defendants in this country are entitled to a fair, but not a perfect trial. "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial," and the Constitution does not demand one.

Sherman v. Smith, 89 F.3d 1134, 1137 (4th Cir. 1996) (quoting United States v. Hasting,

461 U.S. 499, 508, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983)). Further, in Petitioner's

own State habeas proceeding the WVSCA wrote:

> The test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

2021 WL 2581725 at * 4 (citing State v. Miller, 194 W.Va. 3, 16, 459 S.E.2d 114, 127

(1995).[13]

---

[13] As discussed in Footnote 9, herein, in State v. Miller the West Virginia Supreme Court of Appeals explicitly adopted the Strickland test for determining whether a petitioner received ineffective assistance of counsel.

Because Petitioner fails to demonstrate that any State court adjudication resulted in a decision contrary to clearly established federal law or that the state court misapplied clearly established federal law, Petitioner fails to satisfy § 2254(d)(1). Further, because Petitioner has also failed to show that any state court adjudication resulted in a decision that was based on an unreasonable determination of the facts, Petitioner has failed to satisfy § 2254(d)(2). As Petitioner has failed to satisfy either §§ 2254(d)(1) or (d)(2), his second claim is without merit under § 2254, and must be denied.

### C.   Petitioner's Third Claim: Ballistics Expert

As described by the WVSCA in <u>McCartney II</u>, "Petitioner shot his fiancée in the head at point-blank range with a revolver, and she died instantly." <u>McCartney v. Ames</u>, 2021 WL 2581725, at *1. The State presented evidence from a firearms examiner, Phillip Kent Cochran, who testified that the firearm functioned properly:

> The Wesson Firearm revolver chambered in .41 magnum, State's Exhibit #11, was test-fired an examined for mechanical function and safety. No problems were encountered during the examination and test-firing of this revolver. The single action trigger was found to hold three and three quarter pounds of pressure and fired with four pounds of pressure. The double action trigger was found to hold 11-1/4 pounds of pressure and fired with 11-1/2 pounds of pressure. The internal transfer bar functioned as desired and the cocked hammer did not push off or bump off during examination. Based on these examinations, in my opinion, the Wesson Firearms revolver, State's Exhibit #11, functioned as designed.

ECF No. 9-16 at 101 – 102. Cross examination of Mr. Cochran focused on attempting to exclude his testimony based on chain of custody, including that "the witness testified that he did not sign his own case submission form." <u>Id.</u> at 104 – 105.

> Q:   Mr. Cochran, your forensic laboratory case submission form, at the end, did you sign that?

> A:      It has my initials, showing that that is part of the documentation that I examined, but I did not sign that submission form.
> Q:      You didn't sign that you received via evidence locker, laboratory case number 804-894, section ID number F-08-201?
> A:      All of that information is filled out by our Evidence Receiving Technicians.
> Q:      You didn't sign it?
> A:      No, I did not sign it.
> Q:      They didn't sign it?   Nobody   signed   it?
> A:      I don't have a signature on it. . .

Id. at 104.

A Strickland review of the decision not to obtain a ballistics expert shows that Petitioner is not entitled to habeas corpus relief. First, Petitioner must demonstrate that his counsel's actions fell below an objective standard of reasonableness. The record shows that counsel had a strategy of attempting to discredit the State's witness. However, as noted by the WVSCA in Petitioner's habeas appeal:

> [T]he State presented evidence that petitioner shot the victim in the head at point-blank range with a gun that was shown to be in perfect working order. Based upon this evidence, we fail to see how petitioner could satisfy the second prong of the Miller test, as there is no reasonable probability that a firearms expert would have changed the result of the proceeding.

2021 WL 2581725 at * 5.

Second, Petitioner must demonstrate that there was a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. Petitioner fails to show how his counsel's decision to not obtain forensic testing prejudiced him. Petitioner's own statement was that he "accidentally" pulled the trigger of the firearm. A state expert testified that the firearm was in proper working order. Even if a "dueling" defense expert testified that the firearm was not in proper working

order, Petitioner's own statement implicates that he pulled the trigger, not that the firearm discharged on its own. Accordingly, this claim fails to meet either the performance or prejudice prong of <u>Strickland</u>, and Petitioner's claim is without merit. Since the decision to not obtain or call an expert witness could reasonably be viewed as legitimate trial strategy, it does not constitute ineffective assistance unless counsel's decision was so patently unreasonable that no competent attorney would have made it.

Here again, Petitioner has failed to meet either the performance or prejudice prong of the <u>Strickland</u> test, and is not entitled to relief. Because Petitioner fails to demonstrate that any State court adjudication resulted in a decision contrary to clearly established federal law or that the state court misapplied clearly established federal law, Petitioner fails to satisfy § 2254(d)(1). Further, because Petitioner has also failed to show that any state court adjudication resulted in a decision that was based on an unreasonable determination of the facts, Petitioner has failed to satisfy § 2254(d)(2). As Petitioner has failed to satisfy either §§ 2254(d)(1) or (d)(2), his third claim is without merit under § 2254, and must be denied.

In sum, because Petitioner has not demonstrated that any of his three claims regarding the state court's adjudication of his case resulted in a decision contrary to clearly established federal law or that the state court misapplied clearly established federal law, Petitioner fails to satisfy § 2254(d)(1) as to any of his claims. Because Petitioner has also failed to show that any of his three claims regarding the state courts adjudication of his case resulted in a decision that was based on an unreasonable determination of the facts, Petitioner has failed to satisfy § 2254(d)(2) as to any of his

claims. As Petitioner fails to satisfy either §§ 2254(d)(1) or (d)(2), all three claims are without merit under § 2254, and must be denied.

## V.     RECOMMENDATION

For the reasons set forth in this Opinion, it is **recommended** that the petitioner's § 2254 petition be **DENIED** on the merits and **DISMISSED WITH PREJUDICE**. It is further **RECOMMENDED** that Respondent's motion to dismiss [ECF No. 9] be **GRANTED**.

The Petitioner shall have **fourteen (14) days** from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** 28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 104 S.Ct 2393 (1984).

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to all counsel by electronic means.

DATED:      May 25, 2023

/s/ *Robert W. Trumble*
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE